No. 25-40487

# In the United States Court of Appeals for the Fifth Circuit

Sophia Myers, Individually and on behalf of all others similarly situated; Kara Kay, Individually and on behalf of all others similarly situated; Ryann Allison, Individually and on behalf of all others similarly situated; Elaina Amador, Individually and on behalf of all others similarly situated; Berklee Andrews, Individually and on behalf of all others similarly situated; Meagan Ledbetter, Individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

*v.*

Stephen F. Austin State University, Member of the University of Texas System,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Eastern District of Texas, Lufkin Division

## APPELLANT'S CORRECTED OPENING BRIEF ON THE MERITS

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General

Nathaniel A. Plemons
Assistant Solicitor General
Nathaniel.Plemons@oag.texas.gov

*Counsel for Defendant-Appellant*

# Certificate of Interested Persons

No. 25-40487

Sophia Myers, *et al.*, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees,*

*v.*

Stephen F. Austin State University,

*Defendant-Appellant.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Nathaniel A. Plemons

Nathaniel A. Plemons
*Counsel of Record for*
*Defendant-Appellant*

i

## Statement Regarding Oral Argument

The University submits that oral argument would aid the Court's decisional process. *See* Fed. R. App. P. 34(a)(2)(C). This case involves important issues concerning the scope of Title IX relief available at the preliminary-injunction stage and how the Court should evaluate Title IX claims asserted against institutions facing deep budget deficits.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ........................................................ ii

Table of Contents ....................................................................................... iii

Table of Authorities .................................................................................... iv

Introduction ................................................................................................. 1

Statement of Jurisdiction ............................................................................ 3

Statement of Issues ..................................................................................... 3

Statement of the Case ................................................................................. 3

    A.  Factual Background ......................................................................... 3

    B.  Procedural History .......................................................................... 6

Summary of Argument ................................................................................. 9

Argument ...................................................................................................... 11

    I.   The Mandatory Preliminary Injunction Violates Rule 65 Because it is Impermissibly Vague and Overbroad, and Compliance Depends on the Acts of Third Parties Outside the University's Control. ............... 12

        A.  The mandatory preliminary injunction provides no criteria for determining whether a team has been sufficiently "preserved" and contains no compliance timeframe. .................................................. 12

        B.  The preliminary injunction compels the University to achieve results that depend on the acts of independent third parties. ............. 17

    II.  The Preliminary Injunction Is Impermissibly Overbroad Because Title IX Guarantees "Equal Athletic Opportunity," Not a Right to Play One's Preferred Sport at One's Preferred Institution. ...................... 20

    III.  The Balance of the Equities Weighs Against Maintaining this Injunction. ................................................................................................ 26

    IV.  The Court Should Supply Instructions to Guide the District Court's Analysis of the Merits on Remand. ......................................................... 29

Conclusion .................................................................................................... 33

Certificate of Service .................................................................................... 34

Certificate of Compliance ............................................................................ 34

# Table of Authorities

**Page(s)**

**Cases:**

*Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*,
103 F.4th 383 (5th Cir. 2024) ................................................................28

*Balow v. Mich. State Univ.*,
620 F. Supp. 3d 694 (W.D. Mich. 2022) ...........................................27

*Barrett v. W. Chester Univ. of Pa.*,
No. 03-4978, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003) .............24

*Califano v. Yamasaki*,
442 U.S. 682 (5th Cir. 2018) ...............................................................20

*Choike v. Slippery Rock Univ. of Pa.*,
No. 06-622, 2006 WL 2060576 (W.D. Pa. July 21, 2006)..................24

*City of El Cenizo v. Tex.*,
890 F.3d 164 (5th Cir. 2018) ...............................................................26

*Cohen v. Brown Univ.*,
991 F.2d 888 (1st Cir. 1993) ...............................................................21

*In re: Coll. Athlete NIL Litig.*,
No. 20-CV-03919 CW, 2025 WL 1675820 (N.D. Cal. June 6, 2025) .......... 5, 6, 8

*Comptroller of Treasury of Md. v. Wynne*,
575 U.S. 542 (2015).............................................................................21

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
710 F.3d 579 (5th Cir. 2013) ...............................................................20

*Daves v. Dall. Cnty.*,
22 F.4th 552 (5th Cir. 2022) ................................................................20

*De Beers Consol. Mines v. United States*,
325 U.S. 212 (1945).............................................................................25

*Equity in Athletics, Inc. v. Dep't of Educ.*,
639 F.3d 91 (4th Cir. 2011) ........................................................... 21, 24

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
503 U.S. 60 (1992) ...............................................................................25

*Horner v. Ky. High Sch. Athletic Assoc.*,
43 F.3d 265 (6th Cir. 1994) ......................................................21, 25, 26

*John Doe #1 v. Veneman*,
  380 F.3d 807 (5th Cir. 2004) ........................................................................20

*Kelley v. Bd. of Trs.*,
  35 F.3d 265 (7th Cir. 1994) ......................................................................... 21

*Martinez v. Mathews*,
  544 F.2d 1233 (5th Cir. 1976) ................................................................ 11, 19

*Miami Univ. Wrestling Club v. Miami Univ.*,
  302 F.3d 608 (6th Cir. 2002) .......................................................................22

*Navarro v. Fla. Inst. of Tech.*,
  No. 6:22-cv-1950, 2023 WL 2078264 (M.D. Fla. Feb. 17, 2023) ............... 23, 24

*Neal v. Bd. of Trs.*,
  198 F.3d 763 (9th Cir. 1999) ....................................................................... 21

*Noem v. Abrego Garcia*,
  145 S. Ct. 1017 (2025) ................................................................................ 17

*O'Donnell v. Harris Cnty.*,
  892 F.3d 147 (5th Cir. 2018)................................................................... 20, 24

*Pederson v. La. State Univ.*,
  213 F.3d 858 (5th Cir. 2000) ........................................................21, 22, 26, 29

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*,
  111 F.3d 528 (7th Cir. 1997) ............................................................. 17, 18, 19

*Petroleos Mexicanos v. Crawford Enters., Inc.*,
  826 F.2d 392 (5th Cir. 1987) ....................................................................... 18

*Prantil v. Arkema Inc.*,
  986 F.3d 570 (5th Cir. 2021) ................................................................... 15, 17

*U.S. ex rel. Rahman v. Oncology Assocs.*,
  198 F.3d 489 (4th Cir. 1999)........................................................................ 25

*Rest. Law. Ctr. v. U.S. Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023) ........................................................................ 27

*Roberts v. Colo. State Bd. of Agric.*,
  998 F.2d 824 (10th Cir. 1993) ................................................................21, 22, 25

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ......................................................................... 12, 15, 17

*Schrier v. Univ. Of Co.*,
  427 F.3d 1253 (10th Cir. 2005) .................................................................... 19

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) ................................................................... 13, 16

*State v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ............................................................ 17

*Texas v. Ysleta del Sur Pueblo*,
    2018 WL 1566866 (W.D. Tex. Mar. 29, 2018) ............................... 19

*U.S. Steel Corp. v. United Mine Workers of Am.*,
    519 F.2d 1236 (5th Cir. 1975) .........................................................20

**Statutes and Rules:**

20 U.S.C.:
    § 1681(a) ................................................................................... 21, 29
    § 1681(b) ......................................................................................30

28 U.S.C. § 1292(a)(1) ............................................................................ 3

34 C.F.R. § 106.41(c) ....................................................................*passim*

Fed. R. App. P. 34(a)(2)(C) ...................................................................ii

Fed. R. Civ. P.:
    65.......................................................................................... 10, 12, 15
    65(d) ....................................................................................*passim*
    65(d)(2) ........................................................................................ 17

**Other Authorities:**

44 Fed. Reg. 71,413 (Dec. 11, 1979) ....................................................29

Douglas Belkin, *A Generation of American Men Give Up on College*, THE
    WALL STREET JOURNAL, Sept. 6, 2021 .............................................. 3

Letter from Stephanie Monroe, Assistant Sec'y for Civil Rights, Office
    of Civil Rights, U.S. Dept. of Educ., to Colleagues, at 2-4 (Sept. 17,
    2008) ........................................................................................... 32

Office of Civil Rights, U.S. Dep't of Educ., Clarification of
    Intercollegiate Athletics Policy Guidance: The Three-Part Test,
    https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html
    (Jan. 16, 1996) ........................................................................ 29, 30

Preserve, MERRIAM-WEBSTER DICTIONARY ONLINE,
    https://www.merriam-webster.com/dictionary/preserve (last
    accessed September 22, 2025) ........................................................ 13

# Introduction

Faced with a multi-million-dollar budget deficit, earlier this year Stephen F. Austin State University made the painful decision to discontinue certain men's and women's athletic teams, including the women's beach volleyball, golf, and bowling at issue in this appeal.

The University understands and appreciates the desire of student-athletes on these affected teams, like Appellees, to continue participating in their chosen sports, and it has worked to minimize the impact on its students, including by honoring their athletic scholarships and assisting student-athletes with transfers to institutions offering their sports (as it did with Appellees). The University discontinued these teams on May 22, 2025.

Dissatisfied, Appellees—student-athletes on the women's beach volleyball, golf, and bowling teams—sued the University, arguing that its discontinuance of those three teams violated their rights under Title IX of Education Amendments of 1972, whose implementing regulations mandate that universities receiving federal funding "shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

On August 1, fifteen business days before the start of the fall semester, the district court entered a preliminary injunction requiring the University to "preserve" the women's bowling, beach volleyball, and golf teams. But the injunction cannot literally mean "preserve"—by the time of its entry, the teams had been eliminated so preservation would have been meaningless.

The parties thus interpreted the preliminary injunction to require the University, in some form or fashion, to reinstate or restore the teams, but it leaves nearly all of the details unanswered—including what efforts for reinstatement the University must undertake, how compliance will be evaluated, and when it must be achieved.

Although the district court's preliminary conclusion that the University failed to provide substantially proportionate athletic opportunities to women is highly suspect both legally and factually, including its failure to account for the University's award-winning cheer and dance programs—and independently warrants this Court's provision of legal instructions for remand—the preliminary-injunction itself provides the most straightforward ground for reversal. Such a vague injunction, particularly a mandatory injunction, fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, which requires that injunctive relief be carefully detailed and specifically defined as to both its contents and scope.

Moreover, given that reinstatement would require replacing since-departed players and coaches, the University's ability to achieve that end necessarily depends upon the actions of third parties outside of their control. Finally, equity disfavors the Court affirming this logistically and fiscally impracticable injunction where Appellees could mitigate their harm by transferring to another institution and the University has already committed to reinstating two of the three teams at issue.

The University would gladly provide Appellees with their desired athletic opportunities experience if resources and circumstances allowed. But they do not, and the law does not permit the overbroad, vague, and impracticable injunction at issue. The Court should reverse.

## Statement of Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's order granting a preliminary injunction.

## Statement of Issues

Should the Court reverse the district court's entry of a mandatory preliminary injunction where (1) its vague language falls short of Rule 65's specificity requirement, (2) it compels overbroad relief beyond what that which is necessary under Title IX, (3) it compels the University to achieve results dependent on the actions of independent third parties, and (4) the balance of equities weighs against entering an injunction?

## Statement of the Case

### A.  Factual Background

**1.**   Stephen F. Austin State University (the "University" or "SFA") is an educational institution located in Nacogdoches, Texas, and it is a member of the broader University of Texas system. ROA.19. Its student-athletes compete in the NCAA's Division I as part of the Southland Conference and Conference USA. ROA.12. During the 2024-2025 academic year, 10,472 students—approximately 36% male and 64% female—were enrolled at the University. ROA.367.[1] That year, the University provided 555 athletic opportunities (286 male and 269 female). ROA.367.

---

[1] This is in keeping with the rapidly shifting balance of sexes at American universities over the past several years, which have seen a record decline in male enrolment. *See e.g.*, Douglas Belkin, *A Generation of American Men Give Up on College*, The Wall Street Journal, Sept. 6, 2021 (discussing same).

Those numbers do not include the University's highly competitive cheer and dance programs because of how Title IX athletic opportunities have been calculated in the past. ROA.372-73. But they should. ROA.372-75. The University's cheer and dance teams are regionally and nationally competitive. ROA.374-75. No different from the University's other varsity student-athletes, cheer and dance student-athletes are specifically recruited for their competitive ability, face removal from the teams if they do not maintain competitive standards, have dedicated full-time coaches and operating budgets, and are held to the same academic and drug-free standards. ROA.373-75. Indeed, the University will begin hosting regional competitions for these teams in 2026, and competitive cheer is so popular as to be the eighth most popular sport in the United States and third most popular in Texas. ROA.374-75.

One of the most potentially troubling outcomes of this litigation is that if Appellees succeed, the University may be forced to eliminate (or reduce) its popular and well-regarded cheer and dance teams in favor of other women's sports teams. Such an outcome would injure, rather than benefit, its female students. Indeed, paradoxically, if Appellees are correct, then female students attending the University to participate in the cheer and dance programs harms the University's Title IX compliance and requires it to devote additional resources to creating women's sports teams because of the increased female enrollment.

**2.** For the upcoming 2025-2026 academic year, the number of athletic opportunities that the University could offer were also affected by a recently approved antitrust class-action settlement against the NCAA, which the University joined,

concerning the NCAA's rules regarding student-athlete compensation. *See In re Coll. Athlete NIL Litig.*, No. 20-CV-03919 CW, 2025 WL 1675820 (N.D. Cal. June 6, 2025) (granting final settlement approval) ("*House* settlement"). ROA.366. Relevant here, one of the settlement's stipulations imposed roster limits that would take effect in the 2025-2026 academic year, eliminating 60-70 male athletic opportunities and 15-20 female opportunities. ROA.367. For example, in the 2024-2025 school year, the men's football team had 139 members, but the *House* settlement now limits that team to 105 athletes. ROA.367. Likewise, the men's baseball team previously had 57 participants but under the *House* settlement the team would now be limited to 34 athletes. ROA.367. These roster limits affect the financial viability of teams by increasing per-student cost.

With the 2025–2026 school year fast approaching, the Athletic Department still faced a $2 million budget deficit even after making significant cuts to things like service contracts, travel costs, and medical expenditures. ROA.366-67. The remaining deficit forced the University to make the difficult decision that it was necessary to discontinue the men's and women's golf teams, women's beach volleyball team, and the women's bowling team—a decision made official on May 22, 2025. ROA.367-68. These sports were selected because of their high travel costs, small roster sizes, low Texas high school participation, and minimal economic impact on local hotels, restaurants, and businesses. ROA.368-70. Eliminating these teams will result in a projected annual cost savings of approximately $1-1.2 million annually. ROA.369.

Recognizing the difficulty of this decision, the University committed to honoring affected student-athletes' scholarships and to assisting student-athletes wishing to transfer to continue their sport at other institutions, many of whom did. ROA.369.

## B. Procedural History

**1.** Over a month after the University discontinued the teams, Appellees, six members of the women's beach volleyball and bowling teams, sued the University under Title IX, alleging that the University's discontinuance of these teams deprived them of equal athletic opportunities. ROA.9-37. Appellees seek a permanent injunction barring the University from eliminating the discontinued teams or any other varsity women's team "unless and until [the University] is and will be in compliance with Title IX." ROA.36. Simultaneously, Appellees moved for an emergency preliminary injunction that would "enjoin SFA from eliminating the women's beach volleyball, women's bowling, and women's golf teams and from eliminating any other women's sport during the pendency of this case." ROA.58.

On August 1, 24 days (and only 15 business days) before the start of the Fall semester, the district court entered a preliminary injunction. Applying a three-pronged test derived from a 1979 Policy Interpretation issued by the Department of Education, ROA.506, the district court held that Appellees were likely to succeed on the merits of their claim that the University's discontinuance of the affected teams violated Title IX, because male and female athletics opportunities were not "substantially proportionate to their respective enrollments." ROA.507-08.

In so holding, the district court indicated that it would not count the University's cheer and dance teams as athletic opportunities for purposes of determining

substantial proportionality. ROA.508. And it mistakenly believed that, even if it included those opportunities, substantial proportionality still would not be achieved because the court relied on an expert whose opinion was based solely on publicly available—rather than the most current—data concerning the University's athletic department. ROA.507.

The preliminary injunction ultimately ordered the University to "preserve the women's beach volleyball team, women's bowling team, women's golf team, and all other women's varsity teams," ROA.513, despite the fact that the beach volleyball team, bowling team, and golf team had already been eliminated.

**2.**  Despite the preliminary injunction's language, the University interpreted it to require reinstatement of the teams rather than preservation in their current (i.e., eliminated) condition, and it immediately began attempting to comply, despite the logistical challenges of reinstating the teams on such short notice.

But between the University's May 22 announcement that it would discontinue the teams and the time the district court issued its preliminary injunction, much had changed. Twenty-seven out of the thirty-nine affected female student-athletes did not return to the University, and none of the teams had the minimum players required to field a team, much less enough players to continue fielding teams when injuries inevitably occur. ROA.376. Nor were any competitions, schedules, travel budgets, or accommodations for the teams put into place as they normally would have been, making it incredibly difficult—if not impossible—for the University to do so in time for the new school year. ROA.377. As of August 15, the former golf coach agreed to return but had yet to sign a contract. Dkt. 12 Ex. 3 at 2 (McBroom Supp.

Decl.). The former bowling coach declined to return, depriving the University of the facility it had to use for "home" bowling competitions—located hundreds of miles away in Wisconsin—and no other viable candidates applied to the position. *Id.* at 3. Despite recruiting, the University still struggled to find the minimum players necessary to field the teams. *Id.* at 1-4.

Nothing changed about the University's ailing athletic budget either. *Id.* at 4. Indeed, the preliminary injunction would add at least $1 million in expenses to the University's budget. *See* ROA.369 (Athletic Director opining that team discontinuation will save at least $1-1.2 million). Thus, the University was forced to begin contemplating how best to cut the budgets of unaffected sports to fund the teams. Dkt. 12 Ex. 3 at 4.[2]

Facing significant, short-notice disruption to its operations and likely inability to comply with the preliminary injunction despite its best efforts, the University sought a stay of the injunction pending appeal in the district court on August 11. ROA.516. When the district court did not rule that motion, the University moved for an emergency stay pending appeal in this Court on August 18, Dkt. 12 (Mot. Stay), which this Court granted. Dkt. 46-2 (Order Granting Stay).

---

[2] Incidentally, if the teams remained discontinued, in the light of the *House* settlement roster-limit changes, the University could *increase* the percentage of athletic opportunities afforded to women athletes in the 2025–2026 school year as compared to the 2024–2025 year, and it projects further growth. ROA.375-76. And being permitted to count its cheer and dance student-athletes would even further increase the available number of female athletic opportunities. ROA.372-75.

By the time this Court granted the stay, through extensive effort, the University had rehired coaches for the women's beach volleyball and women's golf teams, and it has now voluntarily committed to maintaining these teams. *See* ROA.1226 n.1, ROA.1239 n.5 (Am. Compl. filed September 4). The only live dispute between the parties regarding preliminary injunctive relief appears to concern the women's bowling team.

## Summary of Argument

University athletics departments are in a difficult position. Faced with female enrollment rapidly outpacing male enrollment on one hand and Title IX's worthy promise of equal athletic opportunities on the other, cash-strapped universities are faced with hard choices about what sports teams they can reasonably fund—and which they must cut—to ensure compliance with Title IX. Exacerbating this tension is a byzantine edifice of Department of Education regulations crafted over the last half-century purporting to define and re-define universities' obligations through ad-hoc application of multi-factor analyses and balancing tests.

The district court here seized on one such test to conclude that the University's discontinuance of the three affected teams violates Title IX because female athletic participation opportunities were not substantially proportionate to male opportunities as compared to their numbers. That conclusion is flawed both legally and factually—including because the court discounted the University's cheer and dance teams—and warrants this Court stepping in to provide critical guidance to the district court on remand. Nevertheless, the most glaring problem with the district

court's order is the injunction's failure to comply with Rule 65. The Court should reverse the preliminary injunction for four reasons:

*First*, the injunction fails <u>Federal Rule of Civil Procedure 65</u>'s specificity requirement. The district court's single-sentence command that the University "preserve" women's teams provides no timeframe, no benchmarks, and no guidance on what "preservation" entails. Courts have long recognized that vague preliminary injunctions, especially mandatory ones requiring a party to act rather than refrain from acting, violate due process because parties must know precisely what conduct is required on pain of contempt. But the district court's order leaves the University guessing as to whether "preserve" means retain coaches, recruit new athletes, schedule competitions that had already closed, or something else entirely. Nor does the order inform the University by when it must accomplish these unenumerated goals.

*Second*, the injunction improperly requires the University to achieve results dependent on third parties outside its control. Fielding viable teams depends on student-athletes who choose to participate, coaches willing to return, and conferences having room in their schedules. The University cannot compel student-athletes to re-enroll or join teams, coaches to return, or create openings in already-finalized competition calendars. Requiring compliance with conditions the University cannot control risks exposing it to contempt sanctions despite its good-faith efforts, which equity principles forbid.

*Third*, the injunction is overbroad. Title IX ensures equal athletic opportunity between sexes, *not* a guarantee to play one's preferred sport at one's preferred

institution. Courts nationwide recognize that compliance may be achieved either by expanding opportunities for the underrepresented sex or reducing those for the overrepresented one. By forcing the University to reinstate specific teams, the injunction exceeds what Title IX demands and deprives it of the flexibility the statute affords. A narrower remedy—one that allows the University to equalize athletic opportunities in a fiscally sustainable way—would have remedied any alleged Title IX issues. Such an overbroad remedy merits reversal.

*Finally*, the equities weigh heavily against a preliminary injunction, which required the University to act on short notice before the start of the academic year. Appellees retain their scholarships and the option to play elsewhere with the University's support, while the injunction imposes over $1 million in nonrecoverable costs on an athletic department already in deficit. And the University has already begun reinstating the beach volleyball and golf teams.

## ARGUMENT

The district court's mandatory preliminary injunction should be reversed on three grounds: (1) its vague language falls short of Rule 65's specificity requirement, (2) it compels overbroad relief beyond what is necessary under Title IX, and (3) it compels the University to achieve results dependent on the actions of independent third parties. Exacerbating each of these flaws is the fact that courts "particularly disfavor" mandatory preliminary injunctions like this one, which compel parties to act rather than refrain from acting. *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). And the balance of equities weighs against maintaining this injunction or entering an alternative one. Furthermore, because the district court's assessment of

the merits was flawed, the Court should supply instructions to guide the court's analysis of the Title IX claim on remand.

## I. The Mandatory Preliminary Injunction Violates Rule 65 Because it is Impermissibly Vague and Overbroad, and Compliance Depends on the Acts of Third Parties Outside the University's Control.

Federal Rule of Civil Procedure 65(d) requires that a preliminary injunction "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). The mandatory preliminary injunction here violates this core requirement. It contains a single-sentence command: the University must "preserve the women's beach volleyball team, women's bowling team, women's golf team, and all other women's varsity teams at the University while this case is pending." ROA.513. But this command, bereft of foundational details like a compliance timeframe or guidelines to determine whether the University has sufficiently "preserve[d]" a team, falls well short of Rule 65's breadth and specificity requirements. And it wrongly forces the University to achieve results that depend on the acts of independent third parties over whom the University lacks control.

### A. The mandatory preliminary injunction provides no criteria for determining whether a team has been sufficiently "preserved" and contains no compliance timeframe.

"[T]he specificity provisions of Rule 65(d) are no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id*. Thus, a "district court's order granting the injunction *must* 'state its terms

12

specifically' and 'describe in reasonable detail' the conduct restrained or required." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (emphasis added). Put otherwise, "an ordinary person reading the court's order should be able to ascertain from the document itself what conduct is proscribed." *Id.* at 212.

The district court's single-sentence injunction violates these requirements in at least two ways. First, it offers no clarity as to what, exactly, "preserve" means or when the University can be said to have accomplished "preserv[ation]" under its terms. *See* ROA.513. Second, it sets forth no timeline for performance. Each flaw independently supports reversal.

1.    The district court's preliminary injunction uses one verb to describe the University's obligations: "preserve." *Id.* To the extent that "preserve" merely required to keep the teams intact in their current form, *see* Preserve, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/preserve (last accessed September 22, 2025) ("to keep . . . intact"), it is meaningless. By the time of the preliminary injunction's entry, the teams had been discontinued for months. The majority of the affected female student-athletes already left the University, the teams had no coaches, and the University had arranged for no competitions, travel budgets, or accommodations. ROA.268. The district court surely could not have intended merely to require the University to "preserve" the teams in this condition.

In context—and to afford the preliminary injunction any logical meaning—the district court's order to "preserve" the teams appears to require the University to *reinstate* them to some earlier status and preserve them in that condition. Indeed,

that reflects what Appellees sought in their preliminary-injunction papers. *See* ROA.55 (arguing the teams must be "immediately reinstated"); ROA.62 (Plaintiff requesting "the beach volleyball team [be] reinstated"); ROA.72 (same); ROA.76 (same); ROA.79(same). Requiring "reinstatement" is how the parties interpreted the injunction following its issuance. *See* Dkt. 12 at 6-8 (Mot. Stay), Dkt. 30 at 8-11 (Resp. Mot. Stay). But such an interpretation raises a host of problems: it fails to explain what action the University must take, the condition to which the teams must be restored, and when the University must accomplish this result.

The injunction thus fails to "state its terms specifically and describe in reasonable detail the conduct restrained or required." Fed. R. Civ. P. 65(d). Just consider a sampling of the baseline questions left unanswered:

- When must reinstatement be accomplished?
  - By the start of the Fall semester?
  - By the date of the first NCAA competition?
  - By the date of the first practice?
- What constitutes sufficient reinstatement?
  - Must the University attend a certain number of competitions?
  - Must it have sufficient team members to account for injuries?
  - Must it provide a specific amount of practice times and facilities?
  - Must the student athletes on the teams compete at a particular level?
- How much must the University spend to accomplish these goals?
  - Is there limit to how much it must spend to hire qualified coaches? Or must the University spend any amount necessary to retain a coach?

o Must the University offer scholarships to attract new student athletes for these teams? If so, is there any limit to the amount?

o In contracting for travel services for competitions and practice facilities, is there a limited amount that the University must spend or simply any amount necessary to achieve a result?

To the extent that the preliminary injunction concerned an existing team, a prohibitory injunction merely requiring a school to "preserve" a team in its current form might well satisfy Rule 65. But a mandatory injunction that requires reinstatement—which, as detailed below, depends on the decisions of third parties—necessarily requires far more detail.

Without "know[ing] precisely what it is reviewing," this Court cannot "begin to assess the correctness of the [preliminary injunction] entered by the District Court here without knowing its precise bounds." *Schmidt*, 414 U.S. at 716-17. Such vague injunctions are prohibited because, "[i]n the absence of specific injunctive relief, informed and intelligent appellate review is greatly complicated, if not made impossible." *Id*. at 717. That, and the injunction's vagueness forces the University to aim blindfolded at undefined "preserv[ation]" targets on pain of contempt. *See Prantil v. Arkema Inc.*, 986 F.3d 570, 581 (5th Cir. 2021) ("[R]easonable detail' as to the 'acts required' is necessary.").

Last, as Appellees' First Amended Complaint acknowledges, the University has voluntarily attempted to reinstate the beach volleyball and golf teams—even with this Court's stay of the district court's preliminary injunction in place. *See* ROA.1126 n.1, ROA.1239 n.5; *see also* Dkt. 12 at 2-3 (Mot. Stay Ex. 3, McBroom Supp. Decl.). Appellees conflate these and other *attempts* to comply with an *ability* to fully do so.

Dkt. 30 at 13-15 (Resp. Mot. Stay). But "good-faith effort[s] to comply with the . . . injunction . . . d[o] not waive the specificity requirement[.]" *Scott*, 826 F.3d at 212.

**2.**    The district court's preliminary injunction also lacks another significant component: a date by which compliance must be achieved. The University reads the injunction as requiring immediate action because it required "preserv[ing]" the teams "while this case is pending." ROA.513. And since the case was (and has remained) pending, the University immediately attempted to comply in time for the 2025–2026 school year. *See generally* Dkt. 12 (Mot. Stay Ex. 3 (McBroom Supp. Decl.)). Appellees, on the other hand, have argued that the injunction's lack of a compliance timeline shows that no action is immediately required. Dkt. 30 at 13 (Resp. Mot. Stay). They say that the lack of an explicit compliance timeline gives the University flexibility in achieving compliance. Dkt. 30 at 13-15 (Resp. Mot. Stay).

The gulf between the parties' positions on when, exactly, the University must comply demonstrates the problem. If the parties cannot agree on something as foundational as the deadline for compliance, it is highly unlikely that "an ordinary person reading the [injunction] [w]ould be able to ascertain from the document itself what conduct is [required]." *Scott*, 826 F.3d at 211. But a "district court's order granting the injunction *must* 'state its terms specifically' and 'describe in reasonable detail' the conduct restrained or required." *Id.* (emphasis added).

\*    \*    \*

"The specificity provisions of Rule 65(d) are no mere technical requirements": "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what

conduct is outlawed." *Schmidt*, 414 U.S. at 476. This is particularly true where, as here, the injunction is mandatory: "[R]easonable detail' as to the 'acts required' is necessary," *Prantil*, 986 F.3d at 581, and the preliminary injunction fails these requirements.

### B.  The preliminary injunction compels the University to achieve results that depend on the acts of independent third parties.

Rule 65(d)(2) enables courts to enjoin parties and those "who are in active concert or participation with" them, like their "officers, agents, servants, employees, and attorneys." Fed. R. Civ. P. 65(d)(2). But "because the violation of an equitable decree is punishable as a contempt of court, the decree should not command [parties] to do something that is entirely beyond their control." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 533 (7th Cir. 1997) (Posner, J.) (collecting authorities); *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (clarifying that United States could be ordered to "facilitate," not "effectuate," the return of an alien in a foreign government's custody and whose return was thus outside the United States' power to "effectuate"); *State v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) ("[E]ven assuming Mexico's support is required, assuming [it] has withdrawn its support, and assuming [it] will not support a new MPP, the injunction *still* does not irreparably harm the Government. The injunction only requires good faith on the part of the United States—if the Government's good-faith efforts to implement MPP are thwarted by Mexico, it nonetheless will be in compliance with the district court's order[.]"). All that can be required of a party is that it act in good

faith to comply with an injunction by performing (or abstaining from) acts within its control. *People Who Care*, 111 F.3d at 533.

This basic equitable principle exists for a simple reason: "Willfulness is not an element of civil contempt." *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987). Absent this principle, parties doing their utmost to comply with an injunction nevertheless risk being found in contempt—even if their falling short is due to acts of independent third parties outside their control.

For the University to reinstate the teams, the preliminary injunction here necessarily requires independent third parties outside of the University's control to act. Consider student-athletes. The University must recruit additional student-athletes to replace those who did not return after the teams were discontinued. ROA.376. The University cannot field teams without meeting the minimum number of student-athletes required, and it needs more than the bare minimum to account for potential injuries. ROA.376 The University cannot, of course, force student-athletes to join teams against their will. Similarly, the University must schedule competitions for the teams if they are to be "reinstated." ROA.377. But the University is powerless to change the fact that "[b]y August, all schedules are set, travel budgets are finalized, and hotels and buses are booked." ROA.377.

At most, the University could be required to attempt to persuade student-athletes to join the teams, to hire coaches, and to schedule competitions and travel accommodations, but whether those efforts are ultimately successful is outside of its control. Thus, the mandatory preliminary injunction wrongly forces the University

to achieve results that depend upon the acts of independent third parties over which it has no control, rendering it impermissible. *People Who Care*, 111 F.3d at 533.

Each of the flaws outlined above is exacerbated by the fact that the district court's preliminary injunction ordered the University to act rather than refrain from acting, rendering it a mandatory injunction meriting heightened skepticism. This Court evaluates mandatory preliminary injunctions with a particular skepticism. *See e.g., Martinez*, 544 F.2d at 1243 ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo . . . is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."); *Texas v. Ysleta del Sur Pueblo*, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018) (collecting authorities) (explaining how mandatory injunctions require "defendants [to] take some action … rather than prohibiting them" from acting.). And its sister circuits similarly disfavor mandatory preliminary injunctions. *See e.g.*, *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258-59 (10th Cir. 2005) ("[M]andatory preliminary injunctions" are "specifically disfavored" and "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.") (cleaned up).

The district court's preliminary injunction commands the University to act, not refrain from acting. Appellees sued on June 30—over a month after the University discontinued the teams—so the teams no longer existed by district court's August 1 command to "preserve" them. The injunction compels the University to affirmatively act by reinstating the teams, *supra* at 13-16, making it a mandatory preliminary injunction. *See Martinez*, 544 F.2d at 1243. Thus, the Court should review the

injunction with heightened skepticism because its mandatory nature magnifies its flaws and makes reversal especially appropriate.

## II. The Preliminary Injunction Is Impermissibly Overbroad Because Title IX Guarantees "Equal Athletic Opportunity," Not a Right to Play One's Preferred Sport at One's Preferred Institution.

**1.** "When crafting an injunction, district courts are guided by the Supreme Court's instruction that 'the scope of injunctive relief is dictated by the extent of the violation established.'" *O'Donnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (5th Cir. 2018)), *overruled on other grounds by Daves v. Dall. Cnty.*, 22 F.4th 552 (5th Cir. 2022) (en banc)). A district court therefore "must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579 (5th Cir. 2013) (quoting *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)). "Thus, an injunction must be vacated if it 'fails to meet these standards' and 'is overbroad.'" *O'Donnell*, 892 F.3d at 163 (quoting *Veneman*, 380 F.3d at 818). "The broadness of an injunction refers to the range of proscribed activity . . . [and] is a matter of substantive law." *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n.19 (5th Cir. 1975). The mandatory preliminary injunction here exceeds overbreadth standards because it affords Appellees greater relief than what Title IX requires by commanding that the teams be "preserve[d]." ROA.513. But all Title IX requires is *equal* athletic opportunity, and it grants institutions flexibility in achieving that equality.

Title IX forbids any person from being "excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any education program or activity" "on the basis of sex." *Pederson v. La. State Univ.*, 213 F.3d 858, 877 (5th Cir. 2000) (quoting 20 U.S.C. § 1681(a)). Relevant here, Title IX's implementing regulations mandate that universities receiving federal funding "shall provide equal athletic opportunity for members of both sexes." *Id.* (citing 34 C.F.R. § 106.41(c)).

The equal-opportunity mandate does not require universities to reinstate or continue to support particular teams. It does not even require providing athletic opportunities to students *at all*. Instead, "[e]very court, in construing the [1979] Policy Interpretation and the text of Title IX, has held that a university may bring itself into Title IX compliance by increasing athletic opportunities for the underrepresented gender (women in this case) *or* by decreasing athletic opportunities for the overrepresented gender." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 103 (4th Cir. 2011) (quoting *Neal v. Bd. of Trs.*, 198 F.3d 763, 769-70 (9th Cir. 1999)); *see e.g.*, *Horner v. Ky. High Sch. Athletic Assoc.*, 43 F.3d 265, 275 (6th Cir. 1994) (same); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 269-70 (7th Cir. 1994) (same); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 830 (10th Cir. 1993) (same); *Cohen v. Brown Univ.*, 991 F.2d 888, 894 n.15 (1st Cir. 1993) (same); *cf. Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 569 (2015) ("Whenever a State impermissibly treats like cases differently, it can cure the violation by either 'leveling up' or 'leveling down.'").

Stated differently, "Title IX does not require that a school pour ever-increasing sums into its athletic programs in order to bring itself into compliance[.]" *Horner*,

43 F.3d at 275. Instead, "[f]inancially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population." *Roberts*, 998 F.2d at 830; *see Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 611 (6th Cir. 2002) (affirming decision to eliminate "men's soccer, tennis, and wrestling teams" to decrease participation disparity).

Here, the district court exceeded the scope of its authority under Title IX because it did not order the University to "provide equal athletic opportunity for members of both sexes," *Pederson*, 213 F.3d at 877 (quoting 34 C.F.R. § 106.41(c)), but instead required the University to go beyond that to reinstate and fund particular teams. *See* ROA.513. Title IX does not mandate that relief.

Appellees could not bring a Title IX claim had the University cut all athletic programs because providing no athletic opportunities whatsoever for either sex still "provide[s] equal athletic opportunity[ies] for members of both sexes." *Pederson*, 213 F.3d at 877. Nor could Appellees assert a Title IX claim had the University cut additional men's athletic opportunities or replaced these more expensive women's opportunities with less expensive ones. Put simply, the University can comply with Title IX without reinstating the teams here.

At most, the district court should have issued a narrowly tailored injunction requiring the University to cure any alleged Title IX violation by restoring equal athletic opportunities. Doing so would have allowed the University the choice of further reducing male athletic opportunities while keeping female opportunities stable at their current level, cutting the female opportunities at issue while adding other

lower-cost female opportunities to offset the losses, or implementing similar fiscally sustainable measures promoting equal opportunity. But the district court's injunction granted relief well beyond Title IX's equal-opportunity mandate by requiring University to preserve particular teams, without giving the University any alternative.

2.    Appellees, in their Response to the University's Motion to Stay, provided a handful of largely unreported district court cases to support the proposition that ordering the full reinstatement of particular teams is appropriate relief under Title IX. *See* Dkt. 30 at 8-12 (Resp. Mot. Stay). None is persuasive.

For example, in *Navarro v. Fla. Inst. of Tech.*, No. 6:22-cv-1950, 2023 WL 2078264 (M.D. Fla. Feb. 17, 2023), the court acknowledged that Title IX "provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities" and that [the university] could "choose to eliminate or cap [women's] teams as a way of complying with part one of the three-part test." (second alteration original). *Id.* at *9. It nevertheless departed from this principle to award temporary reinstatement due to a unique factual posture where practical details concerning reinstatement were available and the season was not imminently approaching. *Id*. at **1-3, 9. That differs markedly from the University's situation here: season scheduling, rosters, scholarships, conference obligations, NCAA roster caps, and the fact that many players already transferred make fully reinstating each team to their pre-May 22, 2025, status impracticable. *See* ROA.366-69. Those factual differences matter for tailoring and feasibility. And the preliminary injunction

in *Navarro* provided far more instruction for the defendant university to comply with than did the one here. *See id.*

*Choike v. Slippery Rock Univ. of Pa.*, No. 06-622, <u>2006 WL 2060576</u> (W.D. Pa. July 21, 2006), also involved different facts. In *Choike*, the university had only just announced the cuts; athletes and coaches were still available. *Id.* at *1-2. By contrast, the overwhelming majority of the University's players have dispersed, coaches departed, and conference schedules are set. <u>ROA.366-69</u>. And *Choike* mandated wholesale reinstatement without analyzing whether narrower relief (*e.g.*, expanding athletic opportunities for women or reducing them for men) was available. *Choike*, <u>2006 WL 2060576</u>, at *10. Doing so fails to comport with this Circuit's holding that "the scope of injunctive relief is dictated by the extent of the violation established." *O'Donnell.*, <u>892 F.3d at 163</u>.

Appellees' citation to *Barrett v. W. Chester Univ. of Pa.*, No. 03-4978, <u>2003 WL 22803477</u> (E.D. Pa. Nov. 12, 2003), fails too. That case involved a team facing discontinuation *during* its season, *id.* at *1-2. It therefore implicated none of the logistical obstacles present here. The injunction there preserved the status quo at a time when the team still existed. But Appellees here sued well after the University discontinued the affected teams. *Supra* at 6.

Appellees' remaining citations are similarly unhelpful because none of those authorities adheres to the principle that "a university may bring itself into Title IX compliance by increasing athletic opportunities for the underrepresented gender (women in this case) or by decreasing athletic opportunities for the overrepresented gender." *Equity in Athletics, Inc.*, <u>639 F.3d at 103</u> (noting that this is the holding of

24

[e]very court, in construing the [1979] Policy Interpretation and the text of Title IX"). Nor do these decisions grapple with the principle that "Title IX does not require that a school pour ever-increasing sums into its athletic programs in order to bring itself into compliance[.]" *Horner*, 43 F.3d at 275. Instead, "[f]inancially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population." *Roberts*, 998 F.2d at 830. Those holdings from this Court's sister circuits are particularly apt here and emphasize the discordance between the relief the district court awarded here and the ultimate relief that Appellees could obtain on final judgment.

Nor are Appellees correct to rely on the principle that courts may generally "award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 70-71 (1992). A preliminary injunction may only be "appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945). Courts must thus consider "whether the interim relief sought . . . is a reasonable measure to preserve the *status quo* in *aid of the ultimate equitable relief claimed*." *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 497 (4th Cir. 1999) (emphasis added).

In this case, the ultimate equitable relief would involve the provision of equal athletic opportunities to male and female students alike, not the opportunity to play on specific teams. At bottom, Appellees should not receive relief through a preliminary injunction that they could not receive as a permanent injunction—a mandate

that the University offer Appellees' preferred sports—because all Title IX requires is the provision of equal athletic opportunities. An appropriate injunction would have permitted the University to submit a Title IX compliance plan to achieve equal athletic opportunity through fiscally sustainable means. The Court should reverse.

## III. The Balance of the Equities Weighs Against Maintaining this Injunction.

The Court should reverse and remand for the reasons noted above. And it should refrain from affirming the preliminary injunction because the balance of equities favors the University. *City of El Cenizo v. Tex.*, 890 F.3d 164, 176 (5th Cir. 2018) (detailing preliminary injunction standard). Reversing the mandatory preliminary injunction does not inflict irreparable harm on Appellees, and a renewed injunction would not tangibly benefit their situation.

**1.** Appellees claim that the University has inflicted irreparable harm by depriving them of the chance to participate in their preferred sport. Dkt. 30 at 15-19 (Resp. Mot. Stay). But as discussed, Title IX does *not* require institutions to provide specific sports. It requires "provid[ing] equal athletic opportunity" to both sexes, *Pederson*, 213 F.3d at 877, and permits institutions to do so by "reducing opportunities for the overrepresented [sex] while keeping opportunities for the underrepresented [sex] stable," *Horner*, 43 F.3d at 275. Appellees are not harmed because the University is committed to providing their athletic scholarships or, if they so choose, helping them transfer to another institution that offers their preferred sport like many of their former teammates did. ROA.376.

That, and Appellees' claim that the University's fiscal situation is irrelevant is wrong. Dkt. 30 at 17-18 (Resp. Mot. Stay). "[N]onrecoverable costs of compl[iance] . . . typically constitute irreparable harm." *Rest. Law. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). Courts have found that "[f]inancial harm to [SFA] is a relevant consideration at this stage." *Balow v. Mich. State Univ.*, 620 F. Supp. 3d 694, 710 (W.D. Mich. 2022) (explaining that potential non-refundable expenditures are relevant considerations at the preliminary injunction stage given that defendant school could succeed on the merits). "It makes little sense to require [SFA] to use its finite resources to temporarily reinstate the women's [teams] where, even if [Appellees] succeed on their claims, [SFA] could chart a different course in a few months' time." *Id.* at 712. That is particularly true where, as here, the district court ordered the University to reinstate these teams fifteen business days before the start of the fall semester.

Last, while the University understands Appellees' desire to play their preferred sport without transferring, this does not outweigh the harm inflicted by forcing the University to dig itself further into the red. Appellees possess the means (and the University's full support) to either play their sports at a different school or remain at the University without losing their athletic scholarship.

**2.**    A proper injunction would give the University flexibility in adopting a Title IX compliance plan promoting fiscal sustainability. *Supra* at 20-23. But several possibilities, like eliminating men's roster spots under the *House* settlement, have a strong chance of negatively impacting third parties not before the Court without providing any tangible benefits to Appellees. Another example would be that no

injunction can cure the issues the University has had concerning bowling: it has yet to find a bowling coach, sufficient bowling student-athletes, or even a home bowling venue (even one as far away as Wisconsin, which underscores how untenable maintaining the bowling team is). *Supra* at 8. The best course of action is thus to reverse and remand.

In any event, Appellees acknowledge that the University has voluntarily begun efforts to reinstate the beach volleyball and golf teams even in the face of this Court's stay, changing the underlying equities. ROA.1126 n.1, ROA.1239 n.5. While mootness due to a defendant's voluntary cessation is normally viewed with skepticism, governmental entities—which the University is, given its membership in the UT system—enjoy a "good faith carveout." *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 395 (5th Cir. 2024) "When governmental officials voluntarily cease potentially wrongful conduct," this Court "presume[s] that [they], as public representatives, act in good faith." *Id.* (second alteration original). "And without evidence to the contrary, [the Court] assume[s] that formally announced changes to official governmental policy are not mere litigation posturing." *Id.* (cleaned up). Thus, any injunction purporting to benefit the beach volleyball and golf teams would address an alleged harm the University already committed to remedying, rendering it impermissible because it would attempt to address a non-existent harm, and no evidence contradicts the University's good-faith efforts.

## IV. The Court Should Supply Instructions to Guide the District Court's Analysis of the Merits on Remand.

Although it is sufficient for the Court to resolve this appeal by concluding that the district court's preliminary injunction violates Rule 65(d)'s specificity requirements and is overbroad, the Court should also provide guidance to instruct the district court's assessment of the merits on remand. Two aspects of the district court's analysis of the merits of Appellees' Title IX claim warrant special attention.

*First*, the Court should clarify the standard for determining when a university's athletic participation numbers are substantially proportionate to their enrollment numbers such that they comply with Title IX. As explained, Title IX forbids federally funded universities to exclude any person from, or deny them the benefits of, any educational program or activity "on the basis of sex." 20 U.S.C. § 1681(a). In turn, Title IX's implementing regulations mandate that universities receiving federal funding "shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). To implement that mandate, this Court has explained that courts look to the Department of Education's 1979 "Policy Interpretation to Title IX," *Pederson*, 213 F.3d at 879, which requires an analysis of "[w]hether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments," Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979).

To define substantial proportionality, the district court relied solely on a follow-on 1996 "Dear Colleague" letter issued by the Department of Education's Office of

Civil Rights. *See* ROA.507 (citing Office of Civil Rights, U.S. Dep't of Educ., Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test, https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html (Jan. 16, 1996)). That letter states that the Office of Civil Rights "would also consider [athletic] opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested an able students and enough available competition to sustain an intercollegiate team." *Id.*

The district court's reliance on this Dear Colleague letter as the sole definition for the meaning of "substantial proportionality" was erroneous. For one thing, the Department of Education's reduction of the substantial proportionality test down to a question whether there are enough existing, interested student-athletes of the underrepresented sex to field a team in a given sport seems to edge dangerously close to violating Title IX's prohibitions on quotas. *See* 20 U.S.C. § 1681(b).

But even if this test does not amount to a quota, the district court's reliance on this cramped interpretation of substantial proportionality fails to account for several other critical contextual factors that should bear on the fact-intensive inquiry as to whether a university has afforded both sexes "equal athletic opportunity." 34 C.F.R. § 106.41(c). At the outset, the district court's analysis fails to consider the nationwide trend of rising female enrollment significantly outpacing male enrollment. *See supra* at 3, n.1. That trend is reflected in the University's student body. *See supra* at 3-4. The district court's rigid, numerical analysis also fails to properly account for the year-to-year fluctuations in student enrollment. Under the district court's test,

however, modest variations in student enrollment might cause the University to os-
cillate in and out of Title IX compliance from year-to-year. But a regime under which
cash-strapped university athletic departments must turn on a dime to alternately cut
or reestablish sports teams from year-to-year is not just logistically and fiscally un-
tenable, but inherently disruptive for the student-athletes themselves.

The district court's blinkered approach to assessing substantial proportional-
ity—inappropriately relying exclusively on a three-decade-old agency guidance let-
ter—ultimately fails to adequately account for the demographic, logistical, and fiscal
realities faced by universities today. And because that approach artificially constrains
the inquiry into whether both sexes have "equal athletic opportunity," 34 C.F.R.
§ 106.41(c), the Court should instruct the district court on remand to engage in a
more holistic and flexible inquiry that better respects the regulatory language.

*Second*, the Court should require the district court to count cheer and dance op-
portunities as Title IX equal athletic opportunities. Cheer and dance teams are com-
posed of student-athletes whose discipline, athleticism, and competitive spirit shines
just as brightly as that of student-athletes participating in other sports. The Univer-
sity's nationally competitive and highly successful teams embody this fact.

For example, the cheer and dance teams travel and compete against regional and
national peers governed by the Universal Cheer Association, the Universal Dance
Association, and USA Cheer during their competitive season: late fall to late spring.
ROA.374. The teams exist for the purposes of competition, not merely to support
other teams, and have won a combined total of 39 National Championships (about a
third of the University's 117 total team championships). ROA.374, *see also* ROA.1481

31

(showing that the cheer team spends, at maximum, approximately one-ninth of its time practicing sideline cheering, dedicating the overwhelming majority of time to competitive cheer practice).

The teams are also held to the very same academic and drug-free standards as all other student-athletes. ROA.375, 1487. That, and they are fully integrated into the athletic department with separate full-time head coaches and operating budgets, access to support services, and eligibility for athletics scholarships and awards. ROA.373-74. The Office of Civil Rights would most likely agree that cheer and dance teams—particularly the University's teams—should be counted in Title IX equal athletic opportunity analyses. *Compare* Letter from Stephanie Monroe, Assistant Sec'y for Civil Rights, Office of Civil Rights, U.S. Dept. of Educ., to Colleagues, at 2-4 (Sept. 17, 2008) (providing informal guidance for determining whether a given activity should count in equal athletic opportunity analyses) ("2008 Letter") *with* ROA.372-75 (tracking each 2008 Letter factor and demonstrating that the teams meet them).

And these sports are only growing more popular. The International Olympic Committee, National Association of Intercollegiate Athletics, and National Junior College Athletic Association all recognize cheer as a sport. ROA.1491. Indeed, cheer is in such demand that the University created a third cheer team in May of this year, providing more women's athletic opportunities. ROA.1500-01 (discussing the all-girls teams). The Court should instruct the district court to recognize the cheer and dance teams as athletic opportunities under Title IX. To do otherwise would be to

hold that these student-athletes' hard work, determination, and nationally recognized competitive success is somehow less than that of other athletes.

## Conclusion

The University unequivocally supports its student-athletes, women and men alike. And, if it had the resources necessary, it would gladly provide its students with any and all athletic opportunities they desired. But unfortunately, the University cannot continue expending resources it does not have. The injunction wrongly forces the University to deepen its budget deficit to reinstate the teams. And it does so without providing details as foundational as a compliance timeline or guidelines outlining what the University must do to be found in compliance. The Court should reverse.

Respectfully submitted,

Ken Paxton
Attorney General of Texas

William R. Peterson
Solicitor General

Brent Webster
First Assistant Attorney General

William F. Cole
Principal Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Nathaniel A. Plemons
Nathaniel A. Plemons
Assistant Solicitor General
Nathaniel.Plemons@oag.texas.gov

Counsel for Defendant-Appellant

## CERTIFICATE OF SERVICE

On October 6, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Nathaniel A. Plemons
NATHANIEL A. PLEMONS

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,466 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Nathaniel A. Plemons
NATHANIEL A. PLEMONS